IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BENJAMIN A. OETZMAN,

                Plaintiff,

v.                                                OPINION and ORDER

DODGE COUNTY, WISCONSIN, and JEREMY              24-cv-94-jdp
WOLFE, in his individual capacity,

                Defendants.

---

    This false-arrest case arises from an investigation of police misconduct in Columbia County, Wisconsin. Defendant Jeremy Wolfe, a sergeant with the sheriff's office in neighboring Dodge County, was tasked with investigating the misconduct. Ultimately, Wolfe arrested three City of Portage police employees, including plaintiff Benjamin Oetzman. The charges against Oetzman were later dropped. Oetzman contends in this case that his arrest, for disorderly conduct, was based on his speech and not supported by probable cause and thus violated his rights under the First and Fourth Amendments.

    The police misconduct involved the sustained harassment of the Peetz family in Pardeeville, Wisconsin. Oetzman's purportedly disorderly conduct was his statement "Hey, let's go burn down the Peetzes' house." Dkt. 36, ¶ 21 (cleaned up). Oetzman later said he was only kidding around, but the statement was recorded on a cell phone and sent to the Peetzes, which further intimidated them.

    Both sides move for summary judgment. Dkt. 13 and Dkt. 20. The case turns on whether it was reasonable for Wolfe to consider Oetzman's statement to be a true threat, which is a necessary element of a disorderly conduct charge when the conduct is pure speech. The court will grant defendants' motion for summary judgment and deny Oetzman's. The full

context of the investigation shows that Wolfe could have reasonably believed that, even if Oetzman didn't actually plan to burn down the Peetzes' house, the statement was made intending to intimidate the Peetzes, and thus was a true threat.

BACKGROUND

The following facts are undisputed.

Craig Crary was an officer with the City of Portage Police Department. His wife Casey was also an employee of the police department. For reasons that are not explained, in 2023, Craig and Casey repeatedly harassed the minor daughter of the Peetz family. For example, Craig Crary continuously approached her in public places and threatened to issue her citations. He also sent one of his police colleagues to her school to question her without notifying her parents. Casey Crary called the Peetzes' daughter a "little bitch[]." Dkt. 36, ¶ 6. Casey became a junior volleyball coach at the high school to ensure that the Peetz daughter would be cut from the team.

On behalf of his daughter, Jonathan Peetz petitioned the state court for a temporary restraining order against Craig Crary. In the petition, Jonathan Peetz wrote:

> The best examples of how my family and I are feeling; the house is on fire, our minor child is inside, the fire department was called and arrived, but no one I mean NO ONE is putting out the fire, and our daughter is burning alive and is crying out for us to help her.

*Id.*, ¶ 10. A restraining order was entered against Craig Crary on August 31, 2023.

On September 9, 2023, after a law enforcement social event, plaintiff Benjamin Oetzman was riding in a vehicle with the Crarys. Craig Crary was sitting on Oetzman's lap in the front passenger seat. As they neared the Peetzes' house, Oetzman said, "Hey, let's go burn

2

down the Peetzes' house." *Id.*, ¶ 21 (cleaned up). Craig Crary responded, "I'm down with that," before pointing to a house and saying, "That's the one, up there." *Id.* (cleaned up). Casey Crary was riding in the back seat. She recorded this exchange and posted it to Snapchat. A friend of the Peetzes sent the video to the Peetzes.

The Peetzes contacted law enforcement to report that Craig Crary was harassing and threatening their family. A sergeant with the Columbia County Sheriff's Office was dispatched to meet with the Peetzes and gather additional information. The Columbia County sergeant discussed the matter with the district attorney, who advised him that there was probable cause to arrest the Crarys for violating the restraining order and probable cause to arrest Oetzman for disorderly conduct. The investigation was transferred to the Dodge County Sheriff's Office because Craig and Oetzman were former employees of the Columbia County Sheriff's Office.

Defendant Jeremy Wolfe, a sergeant with the Dodge County Sheriff's Office, was assigned to investigate the incident. Wolfe was briefed on the matter by the Columbia County sergeant, who told him about the advice of the district attorney. Wolfe watched the video and reviewed the temporary restraining order and petition. He then met with the Peetzes. Wolfe noticed that the Peetzes were "visibly upset, shaken up, and extremely concerned." *Id.*, ¶ 38. Kayla Peetz told Wolfe that, after watching the video, she "grabbed her children and left her house." *Id.*, ¶ 39. Jonathan Peetz said that they had not yet returned home "because he [was] afraid and because he believe[d] his family [was] in danger." *Id.*, ¶ 40.

After speaking with the Peetzes, Wolfe went to the Crarys house to further investigate the incident. He spoke with both Craig and Casey Crary. They were ultimately arrested for violating the Peetzes' restraining order.

3

Then, Wolfe went to Oetzman's house to speak with him. Oetzman "admitted to making that stupid comment." *Id.*, ¶ 49. Oetzman said he "was unaware the conversation was being recorded," "had no idea the video was posted on Snapchat," and believed his statement "was an expression of his free speech in a private place between friends." *Id.* Wolfe arrested Oetzman for disorderly conduct. The charges were later dropped on the prosecutor's motion.

Both sides move for summary judgment on the question of whether Oetzman's arrest was supported by probable cause. Dkt. 13 and Dkt. 20. Courts apply the same summary judgment standards when faced with cross-motions. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

ANALYSIS

A. True threats and probable cause

Probable cause to arrest exists if a reasonable officer with the same knowledge as the arresting officer would have believed that the arrestee had committed a crime. *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). This is an objective standard; it does not consider the arresting officer's subjective beliefs. *See Tebbens v. Mushol*, 692 F.3d 807, 819 (7th Cir. 2012). As its name suggests, probable cause requires only a probability of criminal activity. *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010). This means that police officers need more than a mere suspicion to have probable cause to arrest. *See Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013). But they do not need enough evidence to convict the individual or even to show that it is more likely than not that he committed a crime. *See United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000).

4

The crime at issue here is disorderly conduct. In Wisconsin, a person commits disorderly conduct when he "engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance." Wis. Stat. § 947.01 (2023–24). Based on the statutory definition, there are two elements to a disorderly conduct charge: an individual's conduct must have (1) been violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly; and (2) tended to cause or provoke a disturbance. *State v. Breitzman*, 2017 WI 100, ¶ 57, 378 Wis. 2d 431, 904 N.W.2d 93. But these two statutory elements are not the focus of the parties' dispute.

When, as here, the allegedly disorderly conduct is pure speech, there is an additional constitutional requirement. Speech alone may constitute disorderly conduct only if it falls within a category of speech outside the First Amendment's scope. *See In re A.S.*, 2001 WI 48, ¶¶ 1, 16, 243 Wis. 2d 173, 626 N.W.2d 712. A true threat is an example of unprotected speech that can be the basis of a disorderly conduct charge. *See In re Douglas D.*, 2001 WI 47, ¶ 32, 243 Wis. 2d 204, 626 N.W.2d 725. That is the category of speech at issue in this case.

A true threat is a serious expression of intent to commit violence against a particular person or group. *Virginia v. Black*, 538 U.S. 343, 359 (2003). But one can make a true threat without any intent to follow through with actual violence. "For example, an anonymous letter that says 'I'm going to kill you' is 'an expression of an intention to inflict loss or harm' regardless of the author's intent." *Elonis v. United States*, 575 U.S. 723, 733 (2015). However, to face criminal liability for making a true threat, an individual must have a mental state of at least recklessness with respect to how the recipient will understand the message. *Counterman v. Colorado*, 600 U.S. 66, 79–82 (2023). In other words, a person may be convicted for making a

5

true threat only if he was "aware that the recipient could regard his statements as threatening violence but [chose] to utter the statements anyway." *United States v. Taylor*, 148 F.4th 896, 899 (7th Cir. 2025).

The question before the court is whether a reasonable officer in Wolfe's position could reasonably believe that Oetzman's statement was a true threat. The statement itself, especially combined with Crary's affirmation "I'm down with that," contains nothing that explicitly would mark it as a joke. So, objectively speaking, the statement is on par with the *Elonis* example, a letter that says "I'm going to kill you." The issue is whether Wolfe had probable cause to believe that Oetzman had the requisite mental state.

Police officers need "some evidence" demonstrating the required mental state before they have probable cause to arrest an individual. *BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986). The Seventh Circuit has defined "some evidence" as "enough to confer on [the officer] a reasonable belief that [the individual] had committed criminal offenses." *Dollard v. Whisenand*, 946 F.3d 342, 360 (7th Cir. 2019). An officer need not accept an arrestee's contention that he did not act with the requisite intent for the charged crime. *See Marks v. Carmody*, 234 F.3d 1006, 1009 (7th Cir. 2000). Officers may act on the information before them and "let courts resolve conflicts about mental states." *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). So Wolfe was entitled to discount Oetzman's denial of any intent to threaten the Peetzes.

Considering the facts known to Wolfe at the time of Oetzman's arrest, a reasonable officer would have believed that Oetzman made a true threat. In his petition for a temporary restraining order against Craig Crary, Jonathan Peetz had written:

> The best examples of how my family and I are feeling; the house is on fire, our minor child is inside, the fire department was called

6

> and arrived, but no one I mean NO ONE is putting out the fire, and our daughter is burning alive and is crying out for us to help her.

Dkt. 36, ¶ 10. As Oetzman and the Crarys were driving by the Peetzes' house, Oetzman said: "Hey, let's go burn down the Peetzes' house." *Id.*, ¶ 21 (cleaned up); *see id.*, ¶ 34. Oetzman's statement echoes the language in the Peetzes' petition. The similarity suggests that Oetzman knew about the petition's contents, and it conveys the intent to mock Jonathan Peetz's desperation. That lends support to the idea that Oetzman knew that the statement would intimidate the Peetzes, but he chose to say it anyway. Oetzman argues that a reasonable officer would have found it "more plausible that Oetzman was referencing the petition in a sarcastic comment among friends . . . than that he was knowingly or recklessly sending a threatening message to scare Jon Peetz." Dkt. 35, at 12. That's another interpretation of the evidence, but it's not a conclusion that Wolfe was compelled to draw.

The conclusion that Oetzman intended to intimidate is supported by evidence of the actual effects of Oetzman's statement on the Peetzes. Immediately after watching the video, the Peetzes left their house. *See* Dkt. 36, ¶ 39. They were afraid to return because they believed they were in danger. *See id.*, ¶ 40. Oetzman's statement left the Peetzes "visibly upset, shaken up, and extremely concerned." *Id.*, ¶ 38.

The conclusion is also supported by the broader context of the Crary's campaign of harassment. The Crarys were Oetzman's friends and colleagues at the Portage Police Department. Craig Crary had previously sent a different officer colleague to question the Peetzes' daughter. A reasonable officer in Wolfe's position could see that the Peetzes would be intimidated by the Crarys' police colleagues endorsing and participating in the ongoing harassment of the Peetzes.

7

Oetzman's main counterargument is that he didn't know that the video was being recorded or that it would be transmitted to the Peetzes. Dkt. 35, at 9–12, 17. Thus, the argument goes, Wolfe would have no basis to believe that Oetzman intended the purely private exchange to intimidate anyone.

But a reasonable officer could have believed that Oetzman was aware that his statement was being recorded. Oetzman's statement was captured on video by Casey Crary, who was also involved in the harassment of the Peetzes' daughter. She was sitting just behind Oetzman and Craig Crary when she recorded the statement. She was not hiding or obscuring her phone. This might not prove definitively that Oetzman knew about the recording. But it's enough to suggest to a reasonable officer that Oetzman was aware that his statement would not stay private.

The court concludes that Wolfe had probable cause to believe that Oetzman had made a true threat and thus to arrest him for disorderly conduct.

## B.  Qualified immunity

Defendants also assert that Wolfe is entitled to qualified immunity. The doctrine of qualified immunity provides protection to government officials for good-faith errors of judgment. Qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see Abbott*, 705 F.3d at 714–15. When it applies, qualified immunity entitles officials to immunity from the entire lawsuit. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Qualified immunity is an affirmative defense against a false-arrest claim. *Fleming v. Livingston Cnty.*, 674 F.3d 874, 878 (7th Cir. 2012). However, once a qualified-immunity defense is raised, it is the plaintiff's burden to show that it does not apply. *See Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019).

To defeat the assertion of qualified immunity, the plaintiff must satisfy a two-prong test: he must demonstrate that the official (1) violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was clearly established. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). In false-arrest cases, the second prong asks whether the officer had arguable probable cause—that is, whether a "reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 656 (7th Cir. 2024) (citation omitted). If an arrest is *not* supported by arguable probable cause, the officer has violated a "clearly established" constitutional right. *Abbott*, 705 F.3d at 715. But if the officer makes a good faith error in judgment in believing there is probable cause to arrest, qualified immunity applies. *See Marks*, 234 F.3d at 1009.

It is Oetzman's burden to show that the unlawfulness of Wolfe's conduct was clearly established at the time of his arrest. *See Schimandle*, 114 F.4th at 655. But the cases he cites—both involving excessive force—are not closely analogous to his false-arrest claim in general or Wolfe's conduct in particular. *See* Dkt. 35, at 14–15 (citing *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam); *White v. Pauly*, 580 U.S. 73 (2017) (per curiam)).

There's not much more to add to the analysis in the context of qualified immunity. The court will make two brief points. First, Wolfe's decision to arrest Oetzman involved subtle decisions involving Oetzman's mental state underlying threatening comments about the victims of a pattern of police misconduct. Second, Wolfe was aware that his predecessor, the Columbia County sergeant, had discussed the case with the district attorney who said that Oetzman's arrest was sufficiently supported. It would be hard to describe Wolfe as anything

9

other than a law enforcement officer making a good-faith effort to investigate a sensitive and difficult case. In the context of all the information available to Wolfe, he had at least arguable probable cause to arrest Oetzman for disorderly conduct.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 20, is GRANTED.

2. Plaintiff's motion for summary judgment, Dkt. 13, is DENIED.

3. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered October 29, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge